# Rupp et al. v. Hickman et ux.

(Decided Nov. 12, 1937.)

WOODWARD, DAWSON & HOBSON and WILBUR FIELDS for appellants.

LAFON ALLEN and WILSON W. WYATT for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The subject matter of this litigation—filed in the

Jefferson circuit court by appellants as plaintiffs below, against appellees as defendants below—concerns the extent of the rights of plaintiffs to the use of a passway traversing in whole or in part, from north to south, a tract of land containing in the neighborhood of 750 acres and running partly through the bluffs of the Ohio river east of the city of Louisville, Ky. The shape of the tract was and is narrow in width from east to west, and about 2 miles long from north to south, occupying the distance between what is known as the River road on the north, and the Brownsboro road on the south. The evidence is somewhat dim or hazy as to whether or not the route of the involved passway split the tract of land all of its distance so as to divide it into two parts of equal length, or whether it ran a part of its distance on the line separating the tract from the adjoining land on the west, and at some point before reaching the Brownsboro road turning east into the tract of land, thereby separating it over a portion of its south end. However, so far as the merits of the case are concerned it makes no difference which of the two ways the passway runs.

The land, before the Civil War between the states, was owned by John S. Bates, who devised it to his son, Gerard Bates, and it was generally known and referred to as the "Glenview Farm." It was sold in 1868 to James C. and John B. McFeran—the first of whom later became the sole owner. Near the midway point from north to south, and just east of the passway, was the old residence of the first owner of the entire farm which was a commodious brick structure and is referred to in this record as the "Big House." James C. McFeran, after he became sole owner of the farm, sold it to a man by the name of Green and he later sold it to a Mr. Roach, which was in 1899, and the amount of land then conveyed to Roach, after deducting parcels and portions theretofore sold by prior owners to others for suburban residence sites, was 560 acres. Roach thereafter sold other parcels from the acreage he bought from Green, and in 1906 he sold the remaining 350 acres to the Glenview Land Company, a corporation organized for the purpose of forming a country club on the acreage bought by it, but which enterprise failed. The owner, Glenview Land Company, then concluded to

parcel up its land into platted lots or tracts, suitable for roomy suburban residences, and to offer them for sale at public auction, which it did, the sale being set for October 28, 1907, and to be held on the premises. But on that day bidders were few and offered prices were low, both of which combined caused the Glenview Land Company to abandon that project, and it then began to sell at private sale small tracts and parcels of its land, disregardful of the plat it had made for its futile auction sale.

In the meantime there had been established along the eastern line of the tract of land a public road known as Lime Kiln road, running practically parallel with and east of the passway referred to, and from Brownsboro road on the south to the river road on the north. On February 24, 1908, the Glenview Land Company sold and conveyed to Jacob Rupp, the ancestor of plaintiffs—and through whom they obtained their title as his heirs—81.42 acres located near the south end of the entire tract, and between the passway on the west and Lime Kiln road on the east. Considerably prior to that purchase by plaintiffs' ancestor, other persons had acquired parcels of the farm from some of the prior owners, some of which were partly or entirely on the west side of the passway and extending south from the north line of the tract conveyed to Rupp. Some time during the next year (1909) the defendant Baylor Hickman purchased a parcel of land from the Glenview Land Company from what remained after it sold to Jacob Rupp the tract bought by him the previous year. Hickman soon began to negotiate for and later acquired other tracts of land adjoining the one he purchased from the Glenview Land Company, the vendors in which conveyances were purchasers from prior owners, and which after acquired tracts were either never owned by the Glenview Land Company, or had been conveyed by it prior to the Rupp sale.

The involved passway, which now bears the distinguished name of "Glenview Avenue," appears to have had its origin in a sort of bridle path which the more or less limited number of settlers in that and contiguous communities started by riding across the original Bates tract between the River road and the Brownsboro road. It later became a country driveway but was never made

by any court proceedings a public road. As each purchaser of residential sites acquired their respective titles. (beginning on or next to the River road on the north), they improved the passway from the River road out to the south line of their premises, and which was repeated by other purchasers of parcels towards the south end of the tract. It thus became a hard-surfaced road to the extent of such periodically lengthened improvements. Hickman finally acquired a consolidated tract of something near 140 acres, including the old Bates residence, known, as we have stated, as the "Big House," but the title to all of the land purchased by him was taken in the name of his wife, Stannye O. Hickman, the other defendant herein. Since the action was. filed she has died, but proper revivor orders were taken. The solidified entire tract of land finally acquired by Hickman on both sides of Glenview avenue was somewhat irregular in shape. Its north boundary east of the avenue ran to a point known in the record as "Price's Corner," while its north boundary west of the avenue was some distance south from Price's Corner and is. known in the record as "Ballard's Corner." The north gate in controversy here was erected by Hickman across. the avenue at Ballard's Corner while the south gate was. erected some distance to the south on Hickman's south. line. A portion of the avenue, from the beginning, traversed what is now the lawn surrounding the Big House and other lawns connected with other residences composing a part of the present Hickman holdings.

About six years before the filing of this action by the plaintiffs, as the Rupp heirs (and which was on April 30, 1935), Mr. Hickman constructed or repaired a gate across the avenue at Ballard's Corner, and a short. while before the filing of the action he erected a gate where the avenue leaves his south line; and it is known in this record as the "south gate," whilst the first one mentioned is known as the "north gate." Plaintiffs sought by their petition a mandatory injunction against defendants to require them to remove the gates that had been so erected, and a perpetual prohibitory injunction against their right to erect or maintain them in the future. Their grounds for the relief they sought were, of course, based upon the contention that they possessed the right as owners of their tracts of land, to.

an unencumbered easement of travel over the avenue where the gates were constructed, and that their maintenance was an invasion of such alleged right. They based their ownership of the right contended for upon three grounds: (1) A covenant contained in the deed executed to Jacob Rupp, their ancestor, by the Glenview Land Company; (2) an alleged prescriptive right in the public to the unencumbered use of the passway where the gates were erected whereby it became a public road, and (3) a private prescriptive right in plaintiffs whereby they became the owners of and entitled to the unencumbered use of the passway as appurtenant to their land. All of such alleged rights were contested by defendants' pleading, and the court, upon submission after evidence taken, adjudged that the plaintiffs were not entitled to the injunctive relief prayed for and dismissed their petition; but he added by way of surplusage (as we conclude) that the dismissal was without prejudice to relitigation of the same questions in the future if conditions should change whereby the parties might become entitled to other or different relief. From that judgment plaintiffs prosecute this appeal. Since we have concluded that the facts found by the chancellor dispose of all of the grounds relied on adversely to plaintiffs, and that such findings are supported by the proof heard at the trial, we shall discuss them together, and not separately under their respective subdivisions.

The language of the deed of plaintiffs' ancestor, embodying the alleged contractual covenant for the right attempted to be asserted by them, is thus expressed: "It is understood and agreed that the avenue known as 'Glenview Avenue' hereinabove referred to, has been heretofore established, and shall remain open for the use of the said first and second parties and their assigns, and all other persons who now have the right to use the same, as said avenue is now laid off and established through the lands of said first party." Immediately preceding that language a provision is contained establishing "a roadway thirty (30) feet in width, the center line of which is the Northern line of the tract herein described, extending from said Lime Kiln Road to Glenview Avenue, which roadway so established shall be for the use of the property adjoining same on the North and which may be closed and discontinued at any

time by the consent of the owners of all of said property abutting thereon." That road was immediately established and it affords an accessible and convenient route from plaintiffs' land north to the River road, as well as south to the Brownsboro road, since the established road therein provided for intersects the Lime Kiln road along the east border of their farm. It will be perceived that the language of the alleged covenant recognizes and states as a fact that Glenview avenue "has been heretofore established, and shall remain open for the use of the said first and second parties and their assigns * * * as said Avenue is now laid off and established through the lands of the said first party" (Glenview Land Company). No covenant obligations were therein contained with reference to the passway where it traversed parcels of the original Bates tract then owned by others. The obligation was confined to that which was then owned by the Glenview Land Company, since it appears, as will be perceived, that the covenant applied to the avenue "as said Avenue is *now* laid off and established *through* the lands of said *first* party." (Our italics.)

Indeed the grantor could not make an enforceable covenant affecting the rights of other land owners through which the passway ran at the date of that deed, since it could only create dominant rights over lands that it then owned, but could not impose upon prior owners' servient burdens. Therefore, it is quite clear that the alleged covenant rights of plaintiffs do not attach to any portions of the land not owned by the Glenview Land Company at the time it conveyed their tract to their ancestor. If, therefore, the gates in question are erected at the places, or practically at the places, where gates had been formerly erected, under circumstances and conditions and acquiescences so as to create the right of the owners of the servient estate to erect them, then the covenant relied on will not be allowed to impair the right so acquired to maintain them at or near such places. The learned chancellor found the facts to be that at the locations of each of the gates in contest there were existing gates at the time Jacob Rupp obtained his deed; or that Glenview Avenue had theretofore become burdened with the right of the servient owners to maintain such gates at those points.

If such fact findings of the court are sufficiently supported by the testimony heard upon the trial as to create in our minds no more than a doubt, then under the well-established rule we would be without authority to disturb the judgment establishing the basic rights of the parties.

We have carefully read the testimony in this case more than once, and after thoroughly weighing it we have concluded that the chancellor was correct in finding that the right to maintain gates at or practically at the places where Hickman constructed them the last time had been acquired by the owners of the servient estates at those points long before Jacob Rupp obtained his deed from the Glenview Land Company. At least two or three witnesses, possessing extraordinary familiarity with the facts relative to the erection and maintenance of gates across the passway, testified to their prior maintenance at the points referred to, and they were so associated with the management of the farm (at least from the day it was purchased by Roach) as to prove their familiarity with the facts and to entitle their testimony to great weight. As indicated, they were superintendents and managers of the farm for the various owners—one of them being a son of Mr. Roach and another a superintendent, either for him or some subsequent owner or owners. Others of defendants' witnesses exhibited a like familiarity with the facts and substantiated the testimony given by the two or three we have mentioned.

Plaintiffs introduced, including themselves, a greater number of witnesses to the effect that the passway had never been encumbered with gates, except that one of the plaintiffs did admit that at one time there was a gate at or near the point where Hickman erected his north gate. Defendants and many of their witnesses admitted the fact, however, that old gate posts were found at both points where the two gates in contest were erected by Hickman, and which is especially true as to the north gate erected by him. The witnesses for defendants established the fact that gates were actually maintained across the passway at those points, but that they would sometimes fall down, followed by periods of disuse and of temporary suspension, but never in a manner to abandon the right to maintain them. The

great bulk of plaintiffs' witnesses, when their testimony is critically analyzed, did not positively contradict that given by those introduced by defendants. They merely stated that during certain periods, antedating the execution of the Rupp deed, they had occasion to travel the passway in making infrequent trips from the River road to the Brownsboro road and vice versa, and that they never discovered the passway obstructed with closed gates. That testimony might be accepted as literally true, and yet the facts be as testified to by defendants' witnesses, since those trips might have been made upon occasions when the gates were in disuse for any of the reasons indicated. However, some of plaintiffs' disinterested witnesses did testify as to the present existence of old gate posts yet standing, while the only indication of some others were the parts that were in the ground.

Indeed, it appears that the south end of the farm—a part of which is embraced in the Rupp tract—was exclusively cleared agricultural land and the then owner divided it into fields, and at places erected gates across the then passway, but which later became dignified with its present name. We will not enter upon the task of referring to the testimony of each witness introduced by the respective parties, or undertake to analyze their testimony, since it would serve no useful practical purpose to do so. We will, therefore, content ourselves with the statement that, under the rules governing this court in reviewing questions of fact found by a chancellor, we conclude that we are unauthorized to reverse him in the appraisal he gave to the proof heard upon the submission.

But it is contended by learned counsel for plaintiffs in their brief filed in this court that the covenant supra, contained in the Rupp deed, obligated the grantor, and Hickman as a later purchaser from it, to never thereafter obstruct Glenview avenue with gates, regardless of rights that might have been acquired prior thereto, since (as is conceded) that covenant stipulated that the avenue "shall remain open" for the use of the parties to the Rupp deed and all others then having the right to use it. However, it will be observed that the character of passway that was to "remain open" for such uses was such a one as "has been heretofore estab-

lished," and if the *heretofore establishment* of the pass-way was one burdened with the right to maintain gates, it was the only character of passway (as thus burdened) that was to *remain open* as contemplated by the cove-nant contained in the Jacob Rupp deed, since the owner of a passway easement by grant gets no more than is contained in his grant. The servient land owner still has title to the land over which the passway runs and it is encumbered only to the extent of the grant. Am-biguities therein will be resolved in favor of the grantor. Maxwell v. McAtee, 9 B. Mon. 20, 48 Am. Dec. 409; Miller v. Miller, 182 Ky. 797, 207 S. W. 450; Whit-aker v. Yates, 200 Ky. 530, 255 S. W. 102; Raisor v. Lyons, 172 Ky. 314, 189 S. W. 234; Hunt v. Sutton, 188 Ky. 361, 222 S. W. 84, and Reed v. Flynn, 205 Ky. 783, 266 S. W. 644. Numerous other cases since the rendi-tion of the ones cited have approved and followed the same principles, but they are too well established to re-quire a citation of them.

Likewise we have held—in accord with the general principle everywhere approved—that a prescriptive right to a passway easement so acquired is with the modification, qualifications, and encumbrances affecting the right throughout the period necessary to mature it, and when so acquired it will be burdened with all the modifications and encumbrances so imposed. Thus, if the owner of a servient estate, during the period of ac-quisition of a prescriptive easement right over his land by a dominant owner, asserts the right to and actu-ally does maintain gates across it, then the right ac-quired, either by the public, or by a private individual, will be burdened after such acquisition with the right of the owner of the servient estate to continue to main-tain gates across it. Bridwell v. Beerman, 190 Ky. 227, 227 S. W. 165, and authorities cited therein. Therefore, when the court found that the passway in question was burdened with the right of the owner of the servient es-tate at the two points where the contested gates are now erected (or practically so), it became an established fact that the passway referred to in the Rupp deed was one burdened with the right of the owner of the servient estate to continue to maintain such gates. Such finding also adversely determines plaintiffs' insistence growing out of the two prescriptive acquired rights upon which

they relied, as set forth in grounds (2) and (3) supra, the facts so found applying to both character of acquired rights, i. e., the one by the public and the other by plaintiffs individually. Having concluded that the court did not err in the findings of fact so made by it, it necessarily follows that the order made dismissing plaintiffs' petition was proper.

But the court in its opinion, and judgment following it, dismissed plaintiffs' petition "without prejudice to re-apply to this court for injunctive relief upon a showing of facts different from those herein shown, whereunder (i. e., under such different or changed set of facts) his property rights have been invaded to an extent sufficient to warrant injunctive relief." The qualification, we think, was unauthorized under the facts found and may be regarded as surplusage. The rights of the parties are to be determined upon the facts as found by the trial court and which measure all their present interests. Any changed facts which might lie in the womb of the future affecting their present rights could not be regarded as litigated in this case, and the judgment herein would in no sense be a bar to the assertion of such future acquisitions. Therefore, it is our conclusion that the qualification attached to the judgment by the court, whereby its absoluteness is qualified, should not have been made. The court will correct it upon a return of the case as herein indicated.

Wherefore, for the reasons stated, the judgment is affirmed; the whole court sitting.